Filed 12/11/13  P. v. Arrioja CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B244295 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA394217) |
| v. | |
| JAVIER ARRIOJA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sam Ohta, Judge.  Affirmed.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stacy S. Schwartz and Kimberley J. Baker-Guillemet, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

# INTRODUCTION

Defendant Javier Arrioja appeals from a judgment of conviction entered after a jury found him guilty of four counts of lewd acts upon a child aged 14 or 15 (Pen. Code, § 288, subd. (c)(1)) and one count of sending harmful matter with the intent of seducing a minor (*id*., § 288.2, subd. (a)(1)). The trial court sentenced Arrioja to state prison for a term of five years. On appeal, he challenges the admission of his confession. We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A. *The Crimes*

1. Count 1

In 2011 Juan R. was 14 years old and played on two club soccer teams. Arrioja was the coach of one of these teams, the Misioneros. In September or October Juan told Arrioja before a game that his ankle was hurting. Arrioja took Juan to his car and massaged Juan's ankle. Arrioja then slid his hand under Juan's "slider shorts"[1] and touched Juan's penis. He told Juan, "You are going to like it." Juan did not tell anyone about the incident.

2. Count 2

In the middle of October 2011 Juan injured a groin muscle while playing soccer for his other team. He told Arrioja, who told Juan to come to his house so he could give Juan a massage. Juan's father drove Juan to Arrioja's house. Juan's father had seen the words "sports medicine" on Arrioja's business card, so he believed Arrioja knew what he was doing. Arrioja directed Juan to the bedroom and closed the door, while Juan's father waited in the living room.

---

[1] "Slider shorts" are tight shorts worn under soccer shorts to protect a player when sliding. Juan wore them in place of underwear.

Inside the bedroom there were two beds.  The first bed was elevated and did not have a mattress on it, and Juan referred to it as a massage table.  Arrioja told Juan to take off all his clothes and lie down on it.  Juan took off everything but his slider shorts and lay on his back on the massage table.  Arrioja massaged Juan's chest with oil and told Juan, "You're going to like it."  He then began massaging Juan's groin area.  He slid his hand up Juan's leg underneath the shorts, wrapped his hand around Juan's penis and moved his hand up and down.  Again he said, "You're going to like it."  Arrioja then had Juan turn over and massaged Juan's back and buttocks.

The massage lasted about 30 minutes.  When it was over, Juan got dressed and went into the living room.  Juan's father noticed that Juan seemed "a little nervous" when he came out of the bedroom.  Juan did not tell his father what happened because he was scared.

The next day, Juan told his girlfriend what had happened.  He told her not to tell anyone about it.

3.	Count 3

About two weeks later, Juan hurt his back while playing soccer.  When Juan told Arrioja about his injury, Arrioja told Juan to come to his house so Arrioja could give him a massage.  Juan's father and grandfather drove him to the house.  Arrioja told them to wait outside while Juan went in the house.

Juan went into the bedroom, where a man was lying on the massage table watching television.  At Arrioja's direction, Juan took off all his clothes except for his slider shorts and lay down on the bed.  Arrioja began rubbing Juan's chest with oil.  He then slid his hand under Juan's shorts and began rubbing Juan's penis.  Arrioja told Juan, "You're going to like it."  Juan did not say anything because he was scared.  Arrioja then had Juan turn over onto his stomach, and Arrioja massaged Juan's back with oil.

After about 45 minutes, Juan's father called out Juan's name because he thought the massage was taking too long.  Arrioja told Juan to put his clothes on.  Juan did so and then went outside.  Juan's father noticed that Juan seemed nervous and asked him about

3

it.  Juan just said that nothing was wrong.  He did not tell his father and grandfather what happened because he was scared.

4.      Counts 4 and 5

During soccer practice on November 8, 2011, Arrioja asked Juan and another boy to help him get some soccer balls from his car.  The other boy got soccer balls from the trunk of the car.  Arrioja, who was in the driver's seat, told Juan to get in the front passenger seat of the car.  Arrioja took a DVD player from the back seat and handed it to Juan.  Arrioja turned it on and told Juan to watch it.  It showed a man and a woman having sex.  Arrioja reached over and tried to grab Juan's penis.  Juan pushed his hand away, and Arrioja said, "Stop.  You are going to like it."

When Juan got out of the car, Arrioja told him to get soccer balls out of the trunk.  Juan got them and took them over to the soccer field.  He did not say anything to anyone about what had happened because it was personal and embarrassing.

B.      *The Reporting*

Juan texted his girlfriend and told her what had happened.  Juan's girlfriend told her sister, who told their mother, who spoke to the guidance counselor at Juan's school, and, on the counselor's recommendation, to the dean of students at Juan's school.  The dean of students called Juan to her office and told him she had received an anonymous call saying that he might be in danger.  Juan "[w]as appalled" but eventually told her that his coach had fondled him and tried to make him look at pornography.  The dean then notified law enforcement.

C.      *Arrioja's Statements to Law Enforcement*

Arrioja was arrested at his house on February 17, 2012.  On February 19, 2012 Los Angeles County Deputy Sheriff Robert Risiglione and his partner interviewed

4

Arrioja. Deputy Risiglione read Arrioja his *Miranda*[2] rights in Spanish, and Arrioja signed a form indicating that he understood.

After a discussion about the difference between a predator and an honest person who makes a mistake, Deputy Risiglione's partner told Arrioja that what he said "is going to determine whether you're really a good person who just made a mistake or a predator." Arrioja said he had Juan's penis in his hand for three or four seconds when he massaged Juan. Arrioja acknowledged that his actions were inappropriate and had crossed the line.

Arrioja denied that he had a DVD player, showed Juan pornographic videos, or touched him in the car. He also denied becoming aroused when he touched Juan's penis. He acknowledged having "negative impulses" but said he was not "a sick person." He never intended to hurt or humiliate Juan. Arrioja told the deputies he did not touch or molest any of the other players on his team.

D.      *The Evidence Code Section 402 Hearing*

During a break in Deputy Risiglione's testimony at trial, the trial court held a hearing under Evidence Code section 402 on the admissibility of Arrioja's statements in his February 19, 2012 interview. Deputy Tim Abrahams testified that on February 17, 2012 he spoke to Arrioja at Arrioja's home, with Deputy Mejia assisting with translation. They took Arrioja to the sheriff's station, where they advised him of his rights and he indicated that he understood his rights. They began to question him. Arrioja never told the deputies to stop or that he did not want to talk to them anymore. He was not handcuffed, and the deputies spoke to him in a conversational tone. During the course of the interview, he never stated that he wanted a lawyer.

The transcript of the February 17 interview showed that Deputy Mejia asked Arrioja, "Did you understand all your rights, ah, would you like to talk to us?" Arrioja

---

**2**      *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

answered, "Yes, yes, yes."  Deputy Mejia then asked, "do you need an attorney?"  Arrioja answered, "Well I really don't know if I would need one or not.  I don't know."  Deputy Mejia stated, "Okay, he says he understands rights and he—he says he doesn't—he doesn't think he needs a lawyer because he doesn't understand what this is all about."  At that point, Deputy Abrahams interjected, "Okay.  Well that's why I brought you in to talk to you about what's going on."  Deputy Mejia stated, "And that's why . . . we give you the opportunity to come here to talk and find out what is happening."  Arrioja responded, "Yes."  Then the deputies started talking about Juan's allegations.

Deputy Risiglione then testified that on February 19, 2012 he spoke to Arrioja for the purpose of conducting a polygraph test.  After a discussion about soccer, the deputy read Arrioja his *Miranda* rights from a form.[3]  Either he or Arrioja circled "si" after each question on the form, and then Arrioja signed the form.  Arrioja also signed a form consenting to a polygraph test.  The form advised him that the polygraph would be taped and filmed and that he could stop it at any time.

Before reading Arrioja his rights, Deputy Risiglione had asked if he had eaten or slept, and Arrioja said he had not eaten or been able to sleep much.  Arrioja also complained that he was cold because he was wearing only a light shirt and shorts.  Arrioja, however, appeared alert and responsive to questioning.

Counsel for Arrioja argued that "on the date that he gave the statement, both under the polygraph examination and then once the polygraph was over, there were continuous questions of him where he was not adequately advised."  Counsel argued that Deputy Risiglione "put paperwork in front of Mr. Arrioja and told him where he needed to initial and then roughly kind of went over his rights without asking whether or not he expressly

---

**3**      Deputy Risiglione could not recall whether he explained he was going to give Arrioja a polygraph test before reading Arrioja his rights.  He added, "My equipment was out.  And he—I believe he requested a polygraph exam.  And I told him I was there to do the polygraph exam, so I don't know at what point."

waived those rights." He also claimed that Deputy Risiglione told Arrioja both that he had a right to a lawyer and that he did not have a right to a lawyer.

In ruling on the admissibility of Arrioja's statements on February 19, the trial court, citing *People v. Whitson* (1998) 17 Cal.4th 229, first noted that the prosecution had the burden of showing by a preponderance of the evidence that Arrioja had knowingly and voluntarily waived his *Miranda* rights. The court said it looks at the totality of the circumstances in determining whether the deputies had properly advised Arrioja of his rights and whether Arrioja had freely and voluntarily waived his rights to counsel and to remain silent.

The court looked at Arrioja's statement that he did not know whether he needed an attorney in light of the totality of the circumstances: He had been arrested and was in custody. The court stated that the deputies had told Arrioja that they were going to ask him about Juan and his father, "so in his mind he had to have known that he was going to be asked about criminal conduct related to either the father or Juan R." He had stated that he understood his rights and wanted to talk to the deputies. The court further stated that Arrioja's statement about not knowing whether he needed an attorney was not an invocation of his right to counsel. Any confusion "relates to why he is being asked questions. He is not confused about his right to an attorney; he indicated he understood that and that he was willing to talk." The court found "the totality of evidence surrounding the interrogation reveals both an uncoerced choice and a requisite level of comprehension of his *Miranda* rights and that those rights were waived." The court also found that because Arrioja waived his rights on February 17, 2012 when Deputies Abrahams and Mejia had first questioned him, "there was no bar to the subsequent contact for purposes of interrogation."

On the issue of whether Arrioja's statement was voluntary, the trial court noted that "first of all, we have to understand that now he has been in custody for several more days from the first advisement. He knows in the first advisement questioning process that he was being accused of . . . sexual misconduct involving Juan R. So this is not a circumstance where the defendant was unaware of what was going on. He knew." The

7

court stated that Arrioja also signed the admonition form indicating that he understood his rights. The court concluded that "looking at the totality of circumstances surrounding the interrogation, it is clear to the court that the conversation was uncoerced and that there was the requisite level of comprehension of his rights before he began to speak, which shows that he waived his rights . . . both to remain silent and his right to an attorney. So based on all of the foregoing, the court concludes that the defendant was properly advised and that the defendant waived his rights; and therefore, the prosecution will be permitted to introduce" the February 19, 2012 statement.[4]

### E. *Arrioja's Trial Testimony*

Arrioja had coached soccer in Mexico and the United States for 21 years. He had a license for massage and sports medicine in Mexico.

Arrioja usually provided massages at the playing field, but Juan's father brought Juan to Arrioja's house for a massage on two occasions. The first time he gave Juan a massage at his home, soccer practice had ended late and Arrioja had to drive some of the other players home, and he did not want to have them wait while he treated Juan. During the massage, Juan was fully clothed and the door to the bedroom remained ajar. When Arrioja felt a tear in Juan's hamstring, he asked Juan's father to come into the bedroom and told him that Juan was badly injured. Arrioja did not touch Juan's penis.

On the second occasion, Juan's father and grandfather brought Juan to Arrioja's house because Juan had injured his lower back. Arrioja had Juan remove his shirt so that he could rub a special cream into Juan's lower back. Arrioja did not touch Juan's penis or buttocks.

Arrioja never showed Juan pornography or touched Juan's penis while Juan was in his car. Arrioja did not own a device for watching movies and he did not like to watch pornographic movies.

---

[4] The prosecution did not seek to introduce any of Arrioja's statements on February 17, 2012 during his conversation with Deputy Abrahams and Deputy Mejia.

8

Arrioja watched a video recording of his confession and heard himself say he had touched Juan's penis. He explained that he was arrested on Friday, February 17, and interviewed on Sunday, February 19. He had not slept or eaten during that time because he had "never been in a situation like this, and . . . it was like death emotionally." Arrioja had been offered food while he was in jail, but it was "not . . . food for a person." He chose not to eat "[n]ot so much because of that but because of the emotional situation [he] was living through." In addition, the cell where he was being held "was extremely cold." He never told the interviewers, however, that he did not want to speak to them because he did not feel well, although the man who conducted his polygraph examination said that Arrioja "looked bad." He told the deputies who were interviewing him that he had touched Juan's penis even though he had not done so "[b]ecause of the pressure. Because of the way that I was asked those questions. I watched myself there and I can't believe it's me, to tell the truth."

F.    *Rebuttal Testimony*

When Deputy Risiglione interviewed Arrioja, Arrioja looked "maybe a little tired," like "he was waking up." Arrioja told him he had not eaten much and had only slept about three hours the previous night. Arrioja, however, never said he was not feeling well or that he was light-headed or faint. He never said anything to indicate "he may have been mixed up" about what the interviewers were asking him.

## DISCUSSION

Arrioja contends that his "Fifth, Sixth, and Fourteenth Amendment rights were violated by the admission of his involuntary confession." He discusses the question of the voluntariness of his statements to Deputy Risiglione in the context of *Miranda*. A defendant's waiver of his rights and any statement following *Miranda* warnings must be both knowing and intelligent (*People v. Sims* (1993) 5 Cal.4th 405, 440) and voluntary (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219). (See *People v. Whitson*,

9

*supra*, 17 Cal.4th at p. 247.)  In addition, "[b]oth the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial."  (*People v. Linton* (2013) 56 Cal.4th 1146, 1176.)  Even where the police have given *Miranda* warnings, the court must still analyze the voluntariness of the confession.  (*Dickerson v. United States* (2000) 530 U.S. 428, 434-435 [120 S.Ct. 2326, 147 L.Ed.2d 405]; *Miller v. Fenton* (1985) 474 U.S. 104, 110 [106 S.Ct. 445, 88 L.Ed.2d 405]; see *U.S. v. Lall* (11th Cir. 2010) 607 F.3d 1277, 1285 ["'[e]ven if a court finds compliance with *Miranda*, the court must still rule on the confession's voluntariness'"]; *Doody v. Schriro* (9th Cir. 2008) 548 F.3d 847, 860 [*Miranda* "[w]arnings and a waiver are *not* dispositive of a confession's voluntariness"]; cf. *People v. Andreasen* (2013) 214 Cal.App.4th 70, 86 ["statements elicited in violation of . . . *Miranda* principles may not be used against the defendant at trial . . . even if the defendant's statements were voluntary apart from the *Miranda* violation"].)  Because Arrioja's contention that his confession was involuntary appears to encompass both a *Miranda* violation and a due process violation, we address both.  We conclude that the confession was voluntary and therefore admissible.

### A.    *Standard of Review*

Evidence Code section 402, subdivision (b), permits the court to "hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests."  The court may use Evidence Code section 402, subdivision (b), to hear a challenge to the admissibility of a confession or statement on the ground that law enforcement obtained it in violation of *Miranda* (*People v. Whitfield* (1996) 46 Cal.App.4th 947, 958-959) or that it was involuntary (*People v. Lewis* (2001) 26 Cal.4th 334, 377).  On appeal, we examine "the evidence independently to determine whether a defendant's confession was voluntary, but will uphold the trial court's findings of the circumstances surrounding the confession if supported by substantial evidence."  (*Lewis*, *supra*, at p. 383; see *People v. Wash* (1993) 6 Cal.4th 215, 236 ["[a]lthough we independently determine whether, from the

10

undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation], we '"give great weight to the considered conclusions"'" of the trial court].) To the extent the facts are disputed "we must accept the trial court's resolution of disputed facts and inferences, as well as its evaluation of the credibility of witnesses where supported by substantial evidence." (*People v. Cruz* (2008) 44 Cal.4th 636, 667; see *People v. Haley* (2004) 34 Cal.4th 283, 299; *People v. Whitson*, *supra*, 17 Cal.4th at p. 248.)

 

     B.     *Miranda*

     Under *Miranda*, "'a suspect [may] not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and, if indigent, to appointed counsel.' [Citations.] After a knowing and voluntary waiver, interrogation may proceed '"until and unless the suspect clearly requests an attorney."' [Citation.] The prosecution bears the burden of demonstrating the validity of the defendant's waiver by a preponderance of the evidence. [Citation.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 751; accord, *People v. Whitson*, *supra*, 17 Cal.4th at pp. 244-245.)

     Waiver of *Miranda* rights may be express or implied. (*People v. Sauceda-Contreras*, *supra*, 55 Cal.4th at p. 218; *People v. Whitson*, *supra*, 17 Cal.4th at pp. 246-248.) "A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights." (*Sauceda-Contreras*, *supra*, at pp. 218-219.) "'"[W]hen a suspect under interrogation makes an ambiguous statement that could be construed as an invocation of his or her *Miranda* rights, 'the interrogators may *clarify* the suspect's comprehension of, and desire to invoke or waive, the *Miranda* rights.'"'" (*Id.* at p. 217.)

     "'[T]he determination whether statements obtained during [a] custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forego his rights to remain silent

11

and to have the assistance of counsel. [Citation.]'" (*People v. Whitson*, *supra*, 17 Cal.4th at pp. 246-247, quoting *Fare v. Michael C.* (1979) 442 U.S. 707, 724-725 [99 S.Ct. 2560, 61 L.Ed.2d 197].) The "court analyzing the question must consider two distinct components: 'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [Citations.] [¶] . . . [¶] . . . Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.'" (*Whitson*, *supra*, at p. 247, quoting *Moran v. Burbine* (1986) 475 U.S. 412, 421, 422-423 [106 S.Ct. 1135, 89 L.Ed.2d 410].)

Arrioja acknowledges that "a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police. . . . Understanding his rights in full, he waive[s] his right to remain silent by making a voluntary statement to the police." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 388-389 [130 S.Ct. 2250, 176 L.Ed.2d 1098]; see *People v. Whitson*, *supra*, 17 Cal.4th at pp. 247-248 [collecting cases of implied *Miranda* waivers].)

Arrioja contends that the trial court erred in finding that his waiver of his *Miranda* rights was voluntary.[5] He argues that "[a]lthough the trial court was correct in finding that [Arrioja] did not invoke his right to remain silent, the court erred when it found that the confession was voluntary under the totality of the circumstances . . . because the

---

**5** Arrioja does not argue that his waiver of his *Miranda* rights was not knowing or intelligent.

court did not actually consider all of the circumstances surrounding the confession." Arrioja argues that the trial court "failed to take into account the fact that [Arrioja] spoke to the officers when he had not eaten in several days, was very tired, and very cold"; "was given a polygraph test, which is principally used as a police tool of intimidation, and that he was repeatedly told that he had flunked the test"; and "was interrogated at length by numerous officers who laughed at him and mocked him." Arrioja's argument appears to be that the trial court failed to make specific findings as to each of these circumstances. Evidence Code section 402, however, does not require such findings. Subdivision (c) of section 402 provides: "A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute."

The evidence at the Evidence Code section 402 hearing consisted of the testimony of the deputies involved in the interrogations and the transcripts of one of the interrogations. The record shows that although Arrioja complained that he had not eaten or slept and was cold, Arrioja never asked that the deputies stop the interrogation for those reasons, and Arrioja appeared alert and responsive to questioning. Arrioja points to nothing in the record to support his argument that the police gave him a polygraph test in order to intimidate or coerce him into confessing. Deputy Risiglione testified that he "believed [Arrioja] requested a polygraph exam." A transcript of the discussion before the polygraph examination shows that Deputy Risiglione stated, "So we want to know what's happening. Okay?" Arrioja responded, "Yes, I know. I'm also interested in having this . . . in clearing this up because, I mean, like he told me, he says, 'We're going to investigate. We're going to ask—' 'Go ahead and ask anywhere you want,' I told him . . . . [¶] . . . [¶] 'Anything you want to do—I said—because I don't . . . don't . . . I don't feel bad as if I had committed a serious offense or anything, you know. . . .'" In other words, Arrioja apparently agreed to the polygraph examination because he believed it would "clear[] this up" and show his innocence.

The record shows that the deputies twice advised Arrioja of his *Miranda* rights and he indicated that he understood them. He then spoke to the deputies and explained

his side of what had occurred. He did not invoke his right to remain silent. He did not unequivocally invoke his right to counsel, and Arrioja does not contend that he did. (See *People v. Sauceda-Contreras*, *supra*, 55 Cal.4th at pp. 216, 219 ["'[i]f you can bring me a lawyer, that way I[,] I with who . . . that way I can tell you everything that I know and everything that I need to tell you and someone to represent me' was not a clear invocation of his right to counsel"].) Substantial evidence supports the trial court's finding that Arrioja's waiver of his *Miranda* rights at the second interrogation was voluntary. (See *Berghuis v. Thompkins*, *supra*, 560 U.S. at pp. 388-389; *People v. Whitson*, *supra*, 17 Cal.4th at p. 248.)

C.      *Due Process*

As with a claim that a defendant's waiver of his or her *Miranda* rights was involuntary, the "'prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made.'" (*People v. Linton*, *supra*, 56 Cal.4th at p. 1176.) In determining whether a statement was voluntary, the court must look at the totality of the circumstances, including the characteristics of the defendant and the details of the interrogation. (*Ibid.*; *People v. Tully* (2012) 54 Cal.4th 952, 986.) "'In general, a confession is considered voluntary "if the accused's decision to speak is entirely 'self-motivated' [citation], i.e., if he freely and voluntarily chooses to speak without 'any form of compulsion or promise of reward. . . .' [Citation.]" [Citation.] However, where a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law.'" (*Tully*, *supra*, at p. 985.) The confession must be "'"the product of '"a rational intellect and free will."'" [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.'"" [Citations.]" (*Linton*, *supra*, at p. 1176.)

Nothing in the record suggests that the facts that Arrioja had not eaten and was tired and cold "were the 'motivating cause'" of his statements to Deputy Risiglione or

that Arrioja's "will was overborne." (*People v. Linton*, *supra*, 56 Cal.4th at pp. 1176, 1177.) Arrioja never requested that the interrogation stop for any of these reasons, and Deputy Risiglione testified that Arrioja appeared alert and responsive to questioning. In addition, Deputy Risiglione did not promise any advantage to Arrioja, such as to release him or alleviate his discomfort, in exchange for a statement. (See *People v. Tully*, *supra*, 54 Cal.4th at p. 985; *Linton*, *supra*, at p. 1177.)

Nor does the record support Arrioja's claims that the deputies used the polygraph test as a "tool of intimidation," or that he "was interrogated at length by numerous officers who laughed at him and mocked him." As discussed above, Arrioja agreed to the polygraph test, which was preceded by an interrogation on February 17 by Deputies Abrahams and Mejia. The polygraph examination and the second interrogation on February 19 were conducted by Deputy Risiglione, with his partner, Deputy Mejia, and another deputy who was present at some point. At one point during the second interrogation, there was laughter and the unnamed deputy stated, "I like to mess you guys." This evidence does not show that Arrioja "was interrogated at length by numerous officers," or that the interrogation was characterized by deputies laughing at Arrioja or mocking him. Under the totality of the circumstances, Arrioja's statements were voluntary, and the trial court did not err in admitting them.

## DISPOSITION

The judgment is affirmed.

SEGAL, J.[*]

We concur:

PERLUSS, P. J.

ZELON, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.