Filed 3/12/15  In re Christian W. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re CHRISTIAN W., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CHRISTIAN W.,<br><br>        Defendant and Appellant. | A141022<br><br>(Alameda County Super. Ct.<br> No. SJ1302175602) |

Christian W. appeals from the juvenile court's dispositional order adjudging him a ward of the court and placing him on probation.  He contends that the admission of his inculpatory statements despite the failure of the police to adequately re-advise him of his *Miranda*[1] rights violated his constitutional right against self-incrimination.  He also urges that the case must be remanded because the court failed to determine whether the offense was a misdemeanor or a felony, and that several of the conditions of probation are unconstitutionally vague and overbroad.  As the Attorney General acknowledges, remand is required for the court to determine whether the offense was a misdemeanor or a felony.  In addition, several of the probation conditions require modification.  In all other respects, we affirm the order.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

1

# STATEMENT OF THE CASE

On October 16, 2013, a wardship petition (Welf. & Inst. Code, § 602, subd. (a)) was filed alleging that appellant, then 16 years old, had committed felony automobile theft (Veh. Code, § 10851), felony possession of a stolen vehicle (Pen. Code, § 496d, subd. (a)), and misdemeanor resisting a peace officer (Pen. Code, § 148, subd. (a)). Pursuant to appellant's admission, the auto theft was found true as a misdemeanor, and the other counts were dismissed. Appellant was released to his mother on electronic monitoring.

On November 18, 2013, a subsequent wardship petition was filed alleging that appellant possessed a concealed firearm (Pen. Code, § 29610). After a contested jurisdictional hearing on December 11, the allegation was found true with the level of the offense to be determined at disposition. On December 26, at disposition for both petitions, appellant was adjudged a ward of the court and placed in his mother's home, on electronic monitoring, under specified conditions of probation. The matter was continued for 45 days for restitution and to set the level of the offense on the second petition.

On February 10, 2014, the court vacated the order for electronic monitoring and otherwise continued its orders.

Appellant filed a timely notice of appeal on February 13, 2014.

# STATEMENT OF FACTS

On November 14, 2013, appellant's brother M.W. was arrested near their home on Foothill Boulevard for possession of marijuana for sale. Oakland Police Officer Tim Martin obtained and executed a search warrant for their home. Martin found a firearm inside a backpack located between two beds in the bedroom shared by appellant and M.W. The backpack also contained a piece of paper with "something to the effect of Christian's schedule" with "dates and times printed below that." There was no indicia for any other names in the backpack. When Martin arrived to execute the warrant, a young man who did not live there had been in the bedroom with another of appellant's brothers. One of the things Martin was looking for pursuant to the warrant was a gun he suspected might be in M.W.'s possession. At the time he searched the backpack and discovered the

2

gun, Martin was not certain whether it belonged to appellant, M.W., or one of the other men who had been in the room.

On November 15, Martin arrested appellant at the Cambridge Academy. Appellant already had been detained on probable cause to believe he possessed the firearm, based on the indicia in the backpack and his mother's and brother's statements that the bedroom in which it was found was appellant's. When Martin contacted him a little after 11:00 a.m., appellant was in the backseat of the school police officer's patrol car. Martin took him out of the car, searched him again and put him in the backseat of his patrol car. Martin gave appellant a *Miranda* admonishment, reading verbatim from a "statement form" that listed the rights and then asked, "Do you understand each of these rights as I have explained them to you?" As Martin read his rights, appellant appeared to be paying attention and did not appear to be under the influence. He responded, "yes." Martin did not ask him questions about the case, but explained why he was under arrest and discussed information like name and address. Martin explained that policy did not require him to read *Miranda* rights from the form unless he was taking a written statement, but he preferred to do so to avoid any confusion. The form had a place for the suspect to initial, indicating he or she had been read the rights, and a place for the officer to fill in the suspect's responses. Martin did not fill out a form in this case, and was not required to do so.

Martin and appellant remained in the patrol car for about two hours, waiting for the sergeant to come and sign the "Arrest in Field" form, which was required for a juvenile felony arrest. Appellant was "concerned about the case" but they did not "talk about it specifically, just that the gun was found at his residence." Appellant asked repeatedly if he could go home and what was going to happen to him. Appellant knew he had been arrested for the gun that had been found in his room.

Once the arrest in field form was signed, Martin transported appellant to the police station, which took about 10 or 15 minutes. After appellant was processed through intake, Martin placed him in an interview room at 2:10 p.m. The room was about eight feet square, with a table and three chairs; appellant sat at the table, Martin sat directly

3

across from him, and Officer Hector Jimenez sat to Martin's left, between appellant and the closed door. The officers were "significantly larger" than appellant. Appellant was not handcuffed.

Martin did not read appellant his rights a second time, but asked if appellant remembered him reading the rights in the car. Martin initially testified that appellant "responded in the affirmative—I don't remember if the exact words were yes or yeah, but he responded in the affirmative." On questioning by appellant's attorney at the hearing, the officer stated, "I don't remember if it was yes, yeah or nod in the affirmative, but I just—I don't remember exactly the words, but it's something to that effect." Defense counsel asked whether Martin recorded appellant's response anywhere, and Martin replied, "I believe in the report." The police report describing the interview stated, "I asked [appellant] if he remembered me reading him his rights and him answering 'yes' that he understood them. [Appellant] said 'yes.' " Defense counsel played a portion of the recording of the interview and Martin acknowledged that at the moment he asked whether appellant remembered him reading his rights, Martin's radio crackled and he could not hear a verbal response from appellant. Asked whether he could "say with certainty whether or not he responded to you," Martin replied, "I cannot say with certainty. That was the best of my recollection at the time. I did not review the tape, but I knew the whole thing had been taped and audiotaped."

Martin asked appellant about the gun, and appellant said that while walking to the bus stop after school a day or two before, he noticed the gun on the ground near some bushes and put it in his backpack, intending to turn it in to a faculty member at school because he remembered there had been a shooting a couple of weeks before.

## DISCUSSION

### I.

Appellant argues that when Officer Martin asked if appellant remembered being advised of his *Miranda* rights earlier in the day, the crackling of the officer's radio prevented him from hearing appellant's response, and his interrogation without further clarifying that appellant remembered the prior advisement violated *Miranda.* We

4

"examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was proper" and, if there is conflicting evidence, we accept the version of events most favorable to the People to the extent it is supported by the record. (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 207-208; *People v. Williams* (2010) 49 Cal.4th 405, 425 (*Williams*).)

"To counteract the coercive pressure [inherent in custodial surroundings], *Miranda* announced that police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney. [Citation.] After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease. [Citation.] Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. [Citation.] Critically, however, a suspect can waive these rights. [Citation.] To establish a valid waiver, the State must show that the waiver was knowing, intelligent, and voluntary under the 'high standar[d] of proof for the waiver of constitutional rights [set forth in] *Johnson v. Zerbst,* 304 U.S. 458.' " (*Maryland v. Shatzer* (2010) 559 U.S. 98, 103-104.)

" 'The prosecution bears the burden of demonstrating the validity of the defendant's waiver by a preponderance of the evidence.' (*People v. Dykes* (2009) 46 Cal.4th 731, 751; see *Berghuis v. Thompkins* (2010) 560 U.S. 370.) In addition, '[a]lthough there is a threshold presumption against finding a waiver of *Miranda* rights [citation], ultimately the question becomes whether the *Miranda* waiver was [voluntary,] knowing[,] and intelligent under the totality of the circumstances surrounding the interrogation.' (*People v. Cruz* (2008) 44 Cal.4th 636, 668.)" (*Williams*, *supra*, 49 Cal.4th at p. 425.)

" 'No particular manner or form of *Miranda* waiver is required, and a waiver may be implied from a defendant's words and actions. [Citations.]' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1269.) The California Supreme Court "has long recognized that a defendant's decision to answer questions after indicating that he or she understands the *Miranda* rights may support a finding of implied waiver, under the totality of the

5

circumstances. (*People v. Whitson* (1998) 17 Cal.4th 229, 247–248, citing cases.)" (*Gonzales,* at p. 1269.)

"[C]ourts must use 'special care in scrutinizing the record' to determine whether a minor's custodial confession is voluntary (*Haley v. Ohio* (1948) 332 U.S. 596, 599)." (*People v. Lessie* (2010) 47 Cal.4th 1152, 1166-1167.) The required " 'inquiry into all the circumstances surrounding the interrogation . . . includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' " (*Lessie*, at pp. 1166-1167, quoting *Fare v. Michael C.* (1979) 442 U.S. 707, 725.)

Here, the question is whether, after appellant waived his *Miranda* rights upon arrest at his school, Martin was required to readvise appellant and obtain a waiver before questioning appellant at the police station several hours later and, if so, whether he did so properly. " 'After a valid *Miranda* waiver, readvisement prior to continued custodial interrogation is unnecessary "so long as a proper warning has been given, and ['the subsequent interrogation is "reasonably contemporaneous" with the prior knowing and intelligent waiver.' [Citations.]" [Citation.] The necessity for readvisement depends upon various circumstances, including the amount of time that has elapsed since the first waiver, changes in the identity of the interrogating officer and the location of the interrogation, any reminder of the prior advisement, the defendant's experience with the criminal justice system, and "[other] indicia that the defendant subjectively underst[ood] and waive[d] his rights." ' (*People v. Williams, supra,* 49 Cal.4th at p. 434.)" (*People v. Duff* (2014) 58 Cal.4th 527, 555 (*Duff*).)

As described above, Martin testified that at the beginning of appellant's interview, Martin asked if appellant remembered the warnings Martin had read to him in the patrol car. Martin testified that, to the best of his recollection, appellant responded in the affirmative, although Martin could not remember whether appellant gave a verbal response or nodded affirmatively. Martin acknowledged after listening to a recording of

6

this portion of the interview that he could not hear a verbal response over the sound of his radio crackling.

When defense counsel argued for exclusion of appellant's statement on the basis that there was no affirmative response to Martin's question whether appellant recalled being read his rights, the court stated, "No answer on the tape, but he testified under oath that the minor agreed that he remembered the rights and made an affirmative act, either a comment or a nod or something, right?" Defense counsel thought that after listening to the tape, Martin had said "he wasn't sure." The court asked Martin what he had said, and Martin responded, "My best recollection is there was some sort of affirmation, whether it was a nod or a gesture." Nothing could be heard on the tape, and Martin testified he was "not 100 percent positive that he said yes," but that since he knew the interview was taped, "I would have no reason to have a different version in my police report."

In ruling the statement admissible, the court first found that the initial *Miranda* waiver remained valid because "even though it is three hours or a little more, it's basically one continuous act of incarceration, if you will. The minor doesn't go home or go somewhere else. He's always in custody the whole time. The officer is always with him other than for a few minutes when he's being booked, so it's a continuous act, which I think makes the admonition more relevant, if that's—maybe not relevant. It's more in his mind because he is not doing other things. So the time issue, I think, is established to be reasonable under the circumstances." The court then found the evidence established that appellant did respond in the affirmative when Martin, at the police station, asked whether appellant remembered having been read his rights: "As to the other issue, which is whether he answered or not and whether that answer was audible, the officer recalls something positive, not negative. It seems to me that in contrast to what you just said, if the officer had said there was something negative, he would have gone ahead and further questioned, and he didn't because he thought there was something positive, and it wasn't heard on the tape. So by a preponderance of the evidence, which is the burden in this case, I'm going to allow him to testify as to the statement."

7

Appellant distinguishes his case from *Duff, supra,* 58 Cal.4th 555, in which the court found no readvisement was necessary. In *Duff*, the defendant waived his rights and spoke with one officer, then asked to stop; as the officer was preparing to leave, the defendant asked to speak with a different officer. The second officer appeared 23 minutes later and, after small talk and a bathroom break, questioned the defendant and obtained his confession. (*Id.* at pp. 554-555.) The court noted that the second questioning was "just minutes later, in the very same location as before, by a detective specifically summoned by the defendant, a defendant the trial court found had been in prison four times before and was quite familiar with the criminal justice system." (*Id.* at p. 555.)

By contrast, appellant argues he was only 16 years old, the questioning occurred three hours after the initial waiver, after he had been moved from the patrol car outside his school to the police station, and he was not an experienced criminal who could be expected to keep the *Miranda* warnings in mind.

Appellant emphasizes that his criminal history consisted of only the true finding in the automobile theft case that was consolidated with the present case. But his arrest in the auto theft case occurred just a month before his arrest and interview in the present case. At the time of that arrest, appellant gave a statement to the police that was written on one of the standard police department statement forms Martin described in his testimony. Under the printed text of the *Miranda* admonition, next to the question, "Do you understand each of these rights I have explained to you," the word "yes" is written and appellant's initials appear in the space provided for them. It thus appears that although appellant did not have a lengthy criminal history, he had very recent experience receiving *Miranda* warnings and waiving his rights.

None of the circumstances suggests any basis for questioning the voluntariness of appellant's statement. As the trial court noted, appellant was in continuous police custody for the three-hour time period between his initial waiver and the police station interview. While three hours is longer than the 23-minute break in *Duff*, courts have found considerably longer periods did not require readvisement of rights. (*People v.*

*Mickle* (1991) 54 Cal.3d 140, 171 [36 hours]; *Williams, supra,* 49 Cal.4th at p. 435 [40 hours]; *People v. Stallworth* (2008) 164 Cal.App.4th 1079, 1089 [16 hours]; *People v. Thompson* (1992) 7 Cal.App.4th 1966, 1972 [9 hours].) That appellant was a minor did not necessarily mean readvisement was required. (*People v. Lewis* (2001) 26 Cal.4th 334, 338-339.) And while the subsequent interview took place at a different location from where appellant initially received the *Miranda* warnings and waived his rights, he remained in Martin's company continuously, except for part of the time he was being processed through intake and Martin was in the office but approximately 20 to 30 feet away.

Appellant argues that Martin, who was in a position to observe appellant's ability to understand his rights and retain the *Miranda* warnings, decided he needed to readvise appellant but did not do so properly. This characterization is inaccurate. Martin testified that he did not readvise appellant but rather asked if appellant remembered being read his rights. Believing he had received an affirmative response, Martin proceeded to interview appellant. Presumably, if Martin had *not* received an affirmative response to his question, he would have readvised appellant; if this were not the case, there would have been no reason for Martin to make the inquiry. A reminder from the police about a prior waiver is one of the factors that may weigh against the necessity of readvisement. (*People v. Smith* (2007) 40 Cal.4th 483, 504-505; *People v. Mickle, supra,* 54 Cal.3d at p. 171; *People v. Stallworth*, *supra*, 164 Cal.App.4th at p. 1089.) The record supports a conclusion that Martin sought to determine whether he needed to readvise appellant, not that he had decided readvisement was required.

Appellant's reliance upon *People v. Saucedo-Contreras* (2012) 55 Cal.4th 203 (*Saucedo-Contreras*) is no more availing. Appellant offers this case as an example of what he believes "Martin should have done when he could not hear [appellant's] response over his crackling radio." In *Saucedo-Contreras*, the defendant was admonished and indicated he understood his *Miranda* rights, then was asked whether he was willing to waive them. After his initial response— " '[i]f you can bring me a lawyer, that way I[,] I with who . . . that way I can tell you everything that I know and everything that I need to

tell you and someone to represent me' " —the officer asked several questions to clarify the defendant's wishes. (*Saucedo-Contreras*, at pp. 206-207.) *Saucedo-Contreras* held that the initial response was sufficiently ambiguous to justify the clarification questions, the questions were not coercive, and the further responses made clear that the defendant was willing to speak to the officer without an attorney present. (*Id.* at p. 207.)

Here, there is no indication appellant said anything to suggest he wanted an attorney. Rather, the question is whether Martin accurately described appellant as having responded affirmatively when asked if he recalled being read his rights. The only "ambiguity" arises from the fact that no verbal response could be heard on the tape played in court because of the crackle of Martin's radio. Contrary to appellant's characterization, however, Martin never "admitted that he could not have heard a response from [appellant] over the crackling of the radio" *at the time of the interview*; he testified that he could not hear a verbal response *on the tape*. Martin testified that he did not remember whether appellant responded verbally or with a gesture, but that according to his "best recollection," the response was affirmative.

Appellant describes Martin as having testified, after listening to the tape, that he could not be certain whether he "ever got a response" from appellant. In context, it appears from the transcript that Martin was saying he could not be certain whether he got a *verbal* response, not whether he got a response *at all*. After playing the tape, the following exchange occurred between defense counsel and Martin:

"Q: Okay. And did you hear when you answered the question—when you asked the question as to whether or not he recalled you reading his rights?

"A: Yes.

"Q: And at that moment your radio crackles; is that correct?

"A: Yes.

"Q: Okay. And you couldn't hear any verbal response from [appellant], correct?

"A: Not over the radio crackling, no.

"Q: Okay. Can you say with certainty whether or not he responded to you?

10

"A: I cannot say with certainty. That was the best of my recollection at the time. I did not review the tape, but I knew the whole thing had been taped and audiotaped."

Later, when the court asked Martin what he had said about appellant's response, Martin replied, "My best recollection is there was some sort of affirmation, whether it was a nod or a gesture. Listening to the tape, I could not hear him, obviously. [¶] . . . [¶] And I'm not 100 percent positive that he said yes. I never reviewed the tape, but knowing that there was a tape, I would have [had] no reason to have a different version in my police report."

Given the references to "verbal response" in this exchange, and the fact that the police report Martin referred to described a verbal response, it appears Martin understood the inquiry to be about whether there was in fact a verbal response (as indicated in the report) rather than some other indication of assent.

The evidence supports the juvenile court's determination that appellant answered affirmatively when Martin asked if he remembered being read his *Miranda* rights. Martin did not purport to remember the precise manner in which appellant responded, but he was consistent in stating his recollection that appellant gave an affirmative response. The police report relates that appellant replied "yes" to Martin's question. The facts that Martin proceeded with a recorded interview and related appellant having said "yes" in his report support the conclusion that appellant did in fact give this response. As Martin testified, since he knew the interview was recorded, he would have had no reason to say something in his report that would be refuted by the recording.

Appellant's statement was properly admitted.

**II.**

The offense alleged in the subsequent petition, possession of a concealable firearm by a minor in violation of Penal Code section 29610, is a "wobbler" punishable as either a felony or a misdemeanor. (Pen. Code, § 29700, subd. (a)(3); *In re Jorge P.* (2011) 197 Cal.App.4th 628, 632, disapproved on other grounds in *People v. Infante* (2014) 58 Cal.4th 688, 695). When a minor is found to have committed such an offense, the juvenile court is required to explicitly declare the offense to be a felony or a

misdemeanor. (*In re Manzy W.* (1997) 14 Cal.4th 1199, 1204; Welf. & Inst. Code, § 702; Cal. Rules of Court, rule 5.780(e)(5).) If it fails to do so, remand is required. (*In re Manzy W.,* at p. 1204.) Here, the trial court initially deferred decision on the level of the offense to the dispositional hearing, then continued the matter, but ultimately did not make the required determination. The Attorney General agrees that remand is required.

**III.**

Appellant challenges several of the conditions of probation as unconstitutionally vague and overbroad. Most of the challenges are to probation conditions as stated orally by the juvenile court: that he "is not to possess, own, or handle any firearm, *knife*, *weapon*, fireworks, explosives, or *chemicals that can produce explosives*," "is to attend school *regularly*," "is not to be under the influence of any alcoholic beverage or illegal or intoxicating substance nor is he to possess any *associated* paraphernalia," and "is not to possess any narcotics, drugs, or other controlled substances, *related paraphernalia*, or poisons unless prescribed by a physician." The last challenge is to a condition stated only in the minute order, that he "be of *good behavior*." Appellant contends that the italicized language is insufficiently precise to give him, or those charged with enforcing the conditions, fair notice of the proscribed conduct, and that the conditions improperly fail to include a knowledge requirement.

"A probation condition 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness. (*People v. Reinertson* (1986) 178 Cal.App.3d [320,] 324–325.) A probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad. (See [*In re*] *White,* [(1979)] 97 Cal.App.3d [141,] 149–150.)" (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.)

Appellant argues that the weapons prohibition is vague and overbroad because the terms "knife," "weapons" and "chemicals that can produce explosives" could include common household items that are legal for him to possess, such as a table knife or

chlorine. Noting that courts have found seemingly innocuous items to be dangerous or deadly weapons in circumstances where the possessor intended to so use them (e.g., *People v. Page* (2004) 123 Cal.App.4th 1466, 1473 [pencil]), appellant argues that the condition is not sufficiently precise and asks for it be modified to prohibit possession of "any 'dangerous or deadly weapons.' " (*In re R.P.* (2009) 176 Cal.App.4th 562; *People v. Moore* (2012) 211 Cal.App.4th 1179, 1186.)[2] The phrase "deadly or dangerous weapon" refers to both "items specifically designed as weapons, and other items not specifically designed as weapons that the probationer intended to use to inflict, or threaten to inflict, great bodily injury or death." (*Moore,* at p. 1186.) Because it has a "plain, commonsense meaning," it is " 'sufficiently precise for [the probationer] to know what is required of him.' " (*Ibid.*, quoting *In re R.P.,* at p. 568.)

Respondent asks us to uphold the condition as orally stated by the juvenile court by finding that no reasonable person would interpret it to include possession of an innocuous items absent circumstances indicating appellant possessed such an item with the intention of using it to inflict or threaten to inflict great bodily injury. "A probation condition should be given 'the meaning that would appear to a reasonable, objective reader.' " (*People v. Olguin* (2008) 45 Cal.4th 375, 382.) We agree that a reasonable, objective reader would not interpret the probation condition, as stated, to apply to innocuous items used for their intended purpose. Yet if respondent's argument is that the only reasonable interpretation of the condition is that it applies to the enumerated items only to the extent they are dangerous or deadly weapons, surely the better practice would be to avoid ambiguity by so stating. Due process requires that appellant know *in advance* what conduct will violate the conditions of his probation (*In re Victor L.* (2010) 182 Cal.App.4th 902, 913 (*Victor L.*)), and there is no apparent reason *not* to modify the

---

[2] The probation conditions listed in the court's minute order do not precisely track the court's statements on the record. The weapons condition is stated in the minute order as "Do not use or possess any deadly weapon or explosive device." "When there is a discrepancy between the minute order and the oral pronouncement of judgment, the oral pronouncement controls. (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2.)" (*People v. Gabriel* (2010) 189 Cal.App.4th 1070, 1073.)

condition to expressly state what respondent agrees it must mean. Modifying the probation condition to prohibit possession of any dangerous or deadly weapon will make clear to appellant that he is not permitted to possess any item with the intention of using it to threaten or inflict great bodily injury, and will also make clear that he cannot be found to have violated probation for possession of an item that is not specifically designed to be a dangerous or deadly weapon absent such intent.

Appellant further argues the probation condition cannot pass constitutional muster without a requirement that he have knowledge of the circumstances that would constitute a violation. In *People v. Freitas* (2009) 179 Cal.App.4th 747, 752, the defendant posited that absent a knowledge requirement, a probation condition prohibiting possession of firearms or ammunition could result in him being found to have violated probation if he borrowed a car not knowing that the owner's lawfully obtained gun was in the trunk. The *Freitas* court held that the condition should be modified to specify that it applied to "knowing" possession because "the law has no legitimate interest in punishing an innocent citizen who has no knowledge of the presence of a firearm or ammunition." (*Id.* at p. 752.)

Some courts have found express knowledge requirements unnecessary, at least where the probation condition is clearly stated but could be violated unintentionally, because a probationer cannot be found to have violated probation unless the probationer willfully violated a probation condition. (*People v. Moore, supra,* 211 Cal.App.4th at pp. 1186-1187 [stating inadvertent possession of weapon could not be considered willful probation violation]; *People v. Patel* (2011) 196 Cal.App.4th 956, 960-961 [announcing intention to "construe every probation condition proscribing a probationer's presence, possession, association, or similar action to require the action be undertaken knowingly"].)

In *Victor L.*, this court took a different view. The probation condition there required that the minor " 'not remain in any building, vehicle or in the presence of any person where dangerous or deadly weapons or firearms or ammunition exist' " without limiting its proscription to buildings or vehicles that he "*knows* to contain, or people who

14

he *knows* to possess, such weapons." (*Victor L., supra,* 182 Cal.App.4th at p. 912.) Rejecting the argument that an express knowledge requirement was not necessary because the condition should be given a "commonsense reading" and the minor's probation could not be revoked without evidence of a willful violation, we noted, "[w]hile the requirement of proof of willfulness may save Victor from an unconstitutional finding of guilt based on an unknowing probation violation, that is cold comfort to a probationer who suffers from an unfounded arrest and detention based on the whim or vengeance of an arbitrary or mean-spirited probation officer. [Citation.] [¶] Due process requires more. It requires that the probationer be informed *in advance* whether his conduct comports with or violates a condition of probation." (*Id.* at p. 913.)

We adhere to this view. Accordingly, on remand, the juvenile court may choose to phrase this probation condition simply as a prohibition against knowing possession, ownership or handling of any dangerous or deadly weapon. Alternatively, the overbreadth of the condition could be resolved by adding the qualifying language to the condition previously described, prohibiting appellant from knowingly possessing, owning or handling "any dangerous or deadly weapon, including firearms, knives, fireworks, explosives or chemicals that can produce explosives."

Appellant's briefs focus primarily on the weapons condition; his challenge to the terms "good behavior," "regularly," and "related or associated paraphernalia" used in other conditions is not elaborated beyond cursory statements that these terms are imprecise and do not include a knowledge component. The reference to "related or associated paraphernalia" conflates two conditions, one of which directs appellant "not to be under the influence of any alcoholic beverage or illegal or intoxicating substance nor is he to possess any *associated paraphernalia*" while the other states he is "not to possess any narcotics, drugs, or other controlled substances, *related paraphernalia*, or poisons unless prescribed by a physician." In both cases, to the extent there is any ambiguity as to what paraphernalia is related to or associated with alcoholic beverages or intoxicating or illegally-possessed substances, appellant would be protected by addition of the

15

requirement that appellant not *knowingly* possess such items.  The conditions should be modified accordingly.

The requirement that appellant "attend school 'regularly' " is neither vague nor overbroad, particularly when read as part of the condition as a whole:  He is to "[a]ttend school regularly."  "[O]bey all school rules and regulations."  He is "not to leave the school campus during school hours with or without permission of school officials or probation officer."[3]  The meaning of this condition is clear:  Appellant must attend school according to the normal school schedule, unless excused for a valid reason pursuant to the school's  rules and procedures.

The requirement that appellant "be of good behavior" appears only in the December 26 minute order, which states:  "Attend classes or job on time and regularly; be of good behavior and perform well."  The phrases "be of good behavior" and "perform well" do not articulate any standard for judging what behavior is "good" or what constitutes performing "well."  These phrases do not give appellant adequate notice of what conduct would violate the condition and allow for "ad hoc and subjective" evaluation by those enforcing it; they are not " 'sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated.' " (*In re Sheena K.*, *supra*, 40 Cal.4th at p. 890.)  As the phrases were not employed in the conditions of probation stated orally by the court, which control in case of a discrepancy with the minutes (*People v. Gabriel, supra,* 189 Cal.App.4th at p. 1073), it is necessary only to strike them from the minute order.

---

[3] We note that the phrase "with or without permission" appears to have been an error.  As recommended in the dispositional report, the condition stated, "Attend school regularly, obey school rules and regulations, and not leave the school campus during school hours without permission of school officials or the probation officer."  We assume the court did not intend to prohibit appellant from leaving school *with* permission of school officers or the probation officer and simply misspoke in stating this condition.  The minute order, which is silent as to the requirement of remaining on school campus during school hours, should be corrected to accurately state the condition.

16

# DISPOSITION

The matter is remanded to the juvenile court to exercise its discretion to declare the violation of Penal Code section 29610 either a felony or a misdemeanor. The court shall also modify the minute order setting forth the conditions of probation in accordance with the views expressed herein, including:

1. Specify that the weapons prohibition applies to knowing possession, ownership or handling of dangerous or deadly weapons;

2. Specify that appellant is not to *knowingly* possess paraphernalia related to narcotics, drugs or other controlled substances, or associated with alcoholic beverages or illegal or intoxicating substances;

3. Correct the phrasing of the condition requiring appellant not to leave school during school hours without permission of school officials or the probation officer;

4. Delete the requirements that appellant "be of good behavior" and "perform well."

In all other respects, the order is affirmed.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Miller, J.