Filed 9/16/20  P. v. Rosales CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E072661 |
| v. | (Super.Ct.No. INF1601508) |
| LUIS MANUEL ROSALES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  James T. Latting, Judge.

Affirmed with directions.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and

Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Daniel J.

Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

I.  INTRODUCTION

A jury found defendant and appellant, Luis Manuel Rosales, guilty as charged in 16 counts of committing lewd acts with Jane Doe, a child under the age of 14.  (Pen. Code, § 288, subd. (a).)[1]  Defendant was sentenced to 38 years in prison:  the upper term of eight years on count 1, plus consecutive two-year terms on counts 2 through 16.

In this appeal, defendant raises three claims of error.  He first claims that the custodial interview statements he made shortly after his arrest were admitted in violation of his *Miranda*[2] rights and his due process rights.  He specifically claims he did not waive his *Miranda* rights; his due process rights were violated because his interview statements were admitted even though they were involuntary; and, as a Mexican national, he was not advised of his consular notification rights under section 834c and the 1963 Vienna Convention on Consular Relations Treaty (the Vienna Convention).

We find no *Miranda* violation or due process violation.  Defendant impliedly waived his *Miranda* rights; his interview statements were voluntary; and the failure to notify him of his consular rights did not affect his decision to waive his *Miranda* rights, render his interview statements involuntary, or otherwise prejudice him.

Second, defendant claims, and we and the People agree, that defendant is entitled to 49 additional days of presentence custody credits—a total of 1,067, rather than 1,018. Third and lastly, defendant claims the court erroneously imposed a $300 restitution fine

---

[1]  Undesignated statutory references are to the Penal Code.

[2]  *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

and $1,120 in court assessments ($70 for each conviction), without first determining if he was able to pay them. We conclude that any error in imposing the fine and assessments was harmless beyond a reasonable doubt, given that defendant is young and able to work in order to pay the fine and assessments over time.

We modify the judgment to award defendant 49 additional days of presentence custody credits. In all other respects, we affirm the judgment.

## II. FACTUAL BACKGROUND

A. *Prosecution Evidence*

Doe was born in February 2003. When she was in the fifth and sixth grades, Doe, her parents, and her three older siblings lived in a house on La Jolla Avenue in Coachella. Doe was later homeschooled, and in late 2014, she and her family moved to a house on Shadow Rock in Coachella.

Defendant and the wife of Doe's uncle were cousins. Doe first met defendant at her aunt and uncle's anniversary party, when Doe and her family were still living in their La Jolla house. After the anniversary party, defendant and his family became friends with Doe's family; and defendant, his wife, and son often spent time at Doe's house. The two families also went on camping trips together.

When Doe was in the fifth or sixth grade, and she and her family were living in the La Jolla house, defendant began telling Doe that he loved her, and they began sending text messages to each other. One night around this time, Doe and defendant were alone in Doe's living room; Doe's family members had just gone to bed; and defendant was

3

about to leave but said he couldn't find his keys. Defendant then romantically kissed Doe on her lips. Doe did not tell her family about the kiss.

The first charged lewd acts between Doe and defendant occurred when Doe's mother asked Doe to go to the grocery store with defendant. On the way there, defendant said he had forgotten his wallet and took Doe to his home. There, Doe orally copulated defendant and they attempted sexual intercourse, but Doe said it was hurting so defendant stopped (counts 13 & 14).

Then, on "the night of [the] lunar eclipse," in November 2014, Doe snuck out of her house around 1:00 a.m. and met defendant at his truck to watch the eclipse; but, defendant said he forgot to bring the "special glasses" they needed. Inside his truck, defendant kissed Doe (count 3), touched her breasts (count 2), and had vaginal intercourse with her (count 1). After the lunar eclipse, when Doe was still in sixth grade, defendant picked up Doe on her way home from school and took her to her La Jolla house, where they kissed and had sexual intercourse in her living room (counts 4 & 5).

In December 2014, after Doe and her family moved to the Shadow Rock house, Doe's parents went to Mexico for over a week and left Doe and her older siblings at home. During that time, defendant and Doe had sexual intercourse in Doe's bedroom (count 6) and in her siblings' bedrooms (counts 7 & 8). By this time, Doe thought she was defendant's girlfriend, and he told her they were "going to have a future, possibly get married." He also told her not to tell anyone that he was her boyfriend because it was too risky.

4

Another time, when Doe was living in the Shadow Rock house, she and defendant gave her mother a ride to work, then defendant took her to a hotel where they had oral and vaginal sex (counts 15 & 16). One night in early 2016, when his wife and son were away, defendant picked up Doe at her house around 1:00 a.m. and took her to his house where they had oral and vaginal sex (counts 11 & 12).

The last lewd act occurred in April 2016, when Doe met defendant at his truck around 1:00 a.m. and they had oral and vaginal sex (counts 9 & 10). In an April 2016 exchange of e-mails, Doe and defendant indicated that, in five years, they would not have to sneak around anymore.

One night in May 2016, Doe again snuck out of her house and met defendant; but, this time he told her to go back inside her house because his wife's car was outside of Doe's house. After Doe went back inside her house, defendant's wife knocked on Doe's family's front door. Later that night, around midnight, Doe's father came to Doe's room and asked her what she had been doing with defendant. Doe then told her father that she and defendant had been having sexual contact for a year or longer.

In June 2016, the molestations were reported to law enforcement, and a deputy came to Doe's family's home and talked to Doe's parents. Doe's mother later found notes from defendant that he had left hidden for Doe in her family's front yard and gave them to an investigator. Doe underwent a forensic medical examination in June 2016 that showed she had no physical injuries. In July 2016, Doe underwent a forensic interview and later showed an investigator some of the locations where some of the lewd acts occurred.

5

Defendant was arrested on October 11, 2016, and taken to a sheriff's station. After being placed in an interview room, he was *Mirandized* and interviewed. A video recording of the interview was played for the jury. During the interview, defendant was very forthcoming about the lewd acts he had committed with Doe, and his account of the lewd acts was generally consistent with Doe's subsequent trial testimony. Defendant claimed he did not know the acts were unlawful because Doe consented to them. At the conclusion of the interview and at the interviewer's request, defendant wrote letters of apology to Doe and her parents.

B. *Defense Case*

Defendant did not testify, and the defense did not present any evidence.

### III. DISCUSSION

A. *Defendant's Interview Statements Were Properly Admitted*

Defendant claims the trial court prejudicially erred in allowing the prosecution to adduce the custodial interview statements he made following his arrest. He claims the record is insufficient to show that he waived his *Miranda* rights or that his statements were voluntary and therefore admissible. We disagree on both counts.

1. Relevant Background

The defense moved in limine to exclude defendant's interview statements. During an Evidence Code section 402 hearing, Damen Butvidas, a senior investigator for the Riverside County District Attorney's Office, testified for the prosecution. Defendant was arrested on October 11, 2016, at his place of employment in Palm Desert. He was then

placed in handcuffs and transported to the sheriff's station in Thermal where he was placed in an interview room, read his *Miranda* rights, and interviewed.

During the approximately 20-minute drive from defendant's place of employment to the sheriff's station, investigator Butvidas engaged in "casual conversation" with defendant. During this discussion, defendant said he grew up in Indio, graduated from Indio High School, and went to college for a year where he played soccer. He wanted to get a degree in business or marketing. He had no trouble communicating with the investigator in English, and he spoke to the investigator only in English.

A video recording and a transcript of part of defendant's interview were admitted in evidence at the Evidence Code section 402 hearing. When defendant was first in the interview room, the investigator asked defendant whether he wanted "water or anything," and defendant said, "water would be fine." The investigator then asked defendant "booking" questions, including requests for his address, phone number, and where he was born. Defendant said he was born in Mexico. The investigator then told defendant that he wanted to talk to defendant about defendant and Doe, and he wanted to get defendant's "side of the story" because "there's always two sides of the story."

Next, the investigator read defendant his *Miranda* rights from a card.[3] Defendant was told that he had the right to remain silent; anything he said could be used against him in court; he had the right to have an attorney present both before and during any

---

[3] Around 10 minutes elapsed between the time defendant was placed in the interview room and the time he was read his *Miranda* rights.

7

questioning; and, if he could not afford an attorney, one would be appointed for him, free of charge, before and during any questioning, if he so wished. After each *Miranda* advisement, defendant responded, "yes," when he was asked whether he understood the advisement; but, after reading the advisements, the investigator did not ask defendant whether he wished to waive his *Miranda* rights and speak with the investigator. Instead, the investigator proceeded with the interview by saying, "So . . . I don't want to be judgmental or anything like that but I want to hear your side of the story. Okay?"

Defendant was 32 years old at the time of the interview. He answered all of the investigator's questions, and the interview lasted around one hour and 50 minutes. Defendant did not, at any point, indicate that he wished to stop talking, invoke his right to an attorney, or exhibit any hesitation in answering any of the investigator's questions. At the conclusion of the interview, defendant asked to use the restroom and was told that the transporting deputy would allow him to use the restroom.

At no time before or during the interview was defendant advised of his consular notification rights under section 834c and Article 36 of the Vienna Convention. " 'Article 36, paragraph 1(b), of the Vienna Convention provides that law enforcement officials "shall . . . inform" arrested foreign nationals of their right to have their consulate notified of their arrest, and if a national so requests, inform the consular post that the national is under arrest.' [Citation.] Article 36 generally requires that such an advisement be given 'without delay.' [Citation.] California implemented the [Vienna] Convention's requirements in section 834c. [Citation.] [Section 834c] requires law enforcement to inform any 'known or suspected foreign national' of the right to consular

8

notification when the foreign national has been arrested, booked, or detained for more than two hours. (§ 834c, subd. (a)(1).)" (*People v. Leon* (2020) 8 Cal.5th 831, 845 (*Leon*).) The foreign national must also be notified that he or she has "a right to communicate with an official from the consulate of his or her country." (§ 834c, subd. (a)(1).)[4]

At the time of the 2016 interview, investigator Butvidas had been working for the Riverside County Sheriff's Department since 1994. But he had not been trained in, nor did he know about, the requirements of the Vienna Convention. It was his understanding that "the jail makes these notifications once somebody is being housed at the facility"; and, because he had never worked in the jail, he did not know what protocols the jail followed for such notifications.

At the hearing, defense counsel argued that the admission of defendant's interview statements would violate defendant's *Miranda* rights and his due process rights. Counsel emphasized: (1) defendant was not asked whether he wished to waive his *Miranda* rights before he answered the investigator's questions; (2) defendant was not advised of his consular notification rights before or during the interview; and (3) before the interview, there were at least 20 minutes of conversation between the investigator and defendant that were not presented for the court's consideration. Counsel argued that all of these

---

[4] For certain countries, not including Mexico, article 36 of the Vienna Convention requires "mandatory notification" of its national's arrest or detention, "without regard to an arrested or detained foreign national's request to the contrary." (See § 834c, subds. (a)(1), (d).)

factors showed that defendant's will was overborne, rendering his interview statements involuntary and taken in violation of his *Miranda* rights and the Vienna Convention.

The prosecutor countered that defendant impliedly waived his *Miranda* rights when he began answering and continued answering the investigator's questions after he was informed of and acknowledged that he understood each of his *Miranda* rights. The prosecutor also argued that suppressing a confession is not a remedy for a violation of an individual's consular notification rights. Finally, the prosecutor argued that there was no evidence that defendant's interview statements were involuntary. The court denied the defense's motion to exclude defendant's interview statements. During trial, the defense renewed its objection to the admission of the interview statements on the grounds they were involuntary and were taken in violation of *Miranda* and the Vienna Convention. Again, the objections were overruled, and a recording of defendant's interview was played for the jury.

### 2. Defendant Impliedly Waived His *Miranda* Rights

Defendant claims the admission of his custodial interview statements violated his *Miranda* rights because the record is insufficient to show that he made a valid *Miranda* waiver. We conclude that defendant impliedly waived his *Miranda* rights.

"The Fifth Amendment to the United States Constitution, which applies to the states by virtue of the Fourteenth Amendment, provides that no person may be compelled to be a witness against himself or herself." (*People v. Linton* (2013) 56 Cal.4th 1146, 1170-1171 (*Linton*).) In *Miranda*, the high court " 'adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the "inherently compelling

pressures" of custodial interrogation.' " (*Linton,* at p. 1171, quoting *Maryland v. Shatzer* (2010) 559 U.S. 98, 103.)

Under *Miranda*, a suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." (*Miranda, supra,* 384 U.S. at p. 479.)

"To establish a valid *Miranda* waiver, the prosecution bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation." (*Linton, supra,* 56 Cal.4th at p. 1171.) " 'On review of a trial court's decision on a *Miranda* issue, we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*.' " (*People v. Hensley* (2014) 59 Cal.4th 788, 809.)

"In general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them. [Citation.]

11

Law enforcement officers are not required to obtain an express waiver of a suspect's *Miranda* rights prior to a custodial interview.  [Citation.]  Rather, a valid waiver of *Miranda* rights may, as here, be inferred from the defendant's words and actions." (*People v. Cunningham* (2015) 61 Cal.4th 609, 642.)

Here, the trial court impliedly found, and we agree, that substantial evidence shows defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. Defendant began answering and continued to answer the investigator's questions—after the investigator read him his *Miranda* rights and he acknowledged he understood them. The entire record, including the video recording of defendant's interview, shows that defendant's will was not overborne, and he was not under any compulsion to answer the investigator's questions.  Defendant never once indicated that he wished to stop talking, consult with an attorney, or have an attorney present during the interview.

Defendant's willingness to answer the investigator's questions, after he was advised of and acknowledged that he understood his *Miranda* rights, constitutes an implied waiver of his *Miranda* rights.  (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 218-219.)  The record shows that defendant's implied waiver was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." (*Moran v. Burbine* (1986) 475 U.S. 412, 421.)  The record also shows that defendant's implied waiver was "knowing" in the sense that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  (*Ibid.*)

12

3. Defendant's Interview Statements Were Voluntary

Defendant claims his interview statements were inadmissible because they were involuntarily made. Again, we disagree. The entire record shows that defendant's interview statements were voluntary.

A defendant's involuntary confession is inadmissible, and the prosecution has the burden of establishing by a preponderance of the evidence that a defendant's proffered confession was voluntary. (*People v. Carrington* (2009) 47 Cal.4th 145, 169.) Whether a confession was voluntary depends on the totality of the circumstances surrounding its making. (*Ibid.*) We uphold the trial court's factual findings concerning the circumstances surrounding the making of a confession, if substantial evidence supports them, but we independently review the court's voluntariness finding. (*Ibid.*)

" 'In general, a confession is considered voluntary "if the accused's decision to speak is entirely 'self-motivated' [citation], i.e., if he freely and voluntarily chooses to speak without 'any form of compulsion or promise of reward.' " ' " (*People v. Tully* (2012) 54 Cal.4th 952, 985.) Conversely, " '[a] statement is involuntary if it is not the product of " 'a rational intellect and free will.' " ' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 346.) Thus, a confession is involuntary if " 'the defendant's "will was overborne at the time he confessed." ' " (*Id*. at pp. 346-347.)

The trial court here implicitly found, substantial evidence shows, and we agree, that defendant's interview statements were voluntarily. Both before and during the interview, defendant freely spoke with the investigator in English and never once indicated that he misunderstood his *Miranda* rights or any of the investigator's questions.

13

Although defendant was born in Mexico, he grew up in Indio, graduated from Indio High School, and attended college for a year. Thus, defendant was quite capable of understanding the purpose of the interview and the investigator's questions. It is also clear from defendant's interview statements that, at the time of the interview, defendant knew his lewd acts with Doe were unlawful, but he nonetheless freely and voluntarily confessed to them. In sum, all of the circumstances surrounding the interview show that defendant's will was not overborne before or during the interview, that defendant did not speak under any form of compulsion or promise of reward, and that his interview statements were entirely voluntary.

4. The Failure To Notify Defendant of His Consular Rights Was Not Prejudicial

Defendant claims his interview statements were involuntary and inadmissible because he was not notified, before the interview, of his consular rights under the Vienna Convention. On this record, the failure to notify defendant of his consular rights did not render his interview statements involuntary or inadmissible, affect his *Miranda* waiver, or otherwise prejudice him.

The failure to notify a suspect of his or her consular rights does not, in and of itself, render the suspect's subsequent interview statements or confession involuntary and therefore inadmissible. (*Sanchez-Llamas v. Oregon* (2006) 548 U.S. 331, 349; *People v. Enraca* (2012) 53 Cal.4th 735, 756.) But a defendant can raise a consular notification claim "as part of a broader challenge to the voluntariness of his statements to police." (*Sanchez-Llamas*, at p. 350; *Enraca*, at p. 757.)

14

Here, defendant was not notified of his consular rights, as required under article 36 of the Vienna Convention and section 834c. As indicated, "[t]he Vienna Convention requires that law enforcement officers convey to arrested foreign nationals, 'without delay,' that they have the right to have their consulate notified of their arrest. (Vienna Convention, *supra,* art. 36, par. 1(b), at p. 101 (Article 36) see § 834c, subd. (b))." (*People v. Vargas* (2020) 9 Cal.5th 793, 832 (*Vargas*).)

Additionally, Penal Code section 834c implements the requirements of the Vienna Convention by requiring that law enforcement "inform any 'known or suspected foreign national' of the right to consular notification when the foreign national has been arrested, booked, or detained for more than two hours." (*Leon*, *supra*, 8 Cal.5th at p. 845.) Subject to exceptions not applicable here, these include notifying the foreign national that he or she has the right to have his country's consulate notified of his or her arrest or detention and that he or she has the "right to communicate with an official from the consulate of his or her country." (§ 834c, subds. (a)(1), (d).)

By the time defendant's interview concluded, more than two hours had passed since defendant was arrested at his place of employment. During that over two-hour period, defendant was not told he had the right to have the Mexican consulate notified of his arrest or of his right to speak with a consulate official (§ 834c, subd. (a)(1)); even though, before his interview, he told the investigator that he was born in Mexico and, thus, indicated that he possibly was a Mexican national.

Nonetheless, on this record, defendant has not shown that the failure to notify him of his consular rights had any bearing on his decision to waive his *Miranda* rights or the

15

voluntariness of his subsequent interview statements.  Nor has he shown that the failure to notify him of his consular rights otherwise prejudiced him.

Our Supreme Court has rejected similar consular notification claims where the defendants failed to establish any resulting prejudice—that is, where they failed to establish any link between the failure to notify them of their consular rights and their subsequent statements to law enforcement.  (*Leon*, *supra*, 8 Cal.5th at pp. 846-847 [rejecting the defendant's consular notification claim where the defendant "established no relation whatsoever between his confession and the lack of consular notice"]; *Vargas*, *supra*, 9 Cal.5th at p. 833 [rejecting as "far too speculative" the defendant's claim that he "might have testified at trial had a consular official advised him to remain silent when questioned by the police"].)

In *Vargas,* our Supreme Court recognized that, "[a] defendant is entitled to relief under the Vienna Convention if the defendant can show that a violation occurred, *and that the violation resulted in prejudice*.  [Citations.]  Although Article 36 ' "secures only a right of foreign nationals to have their consulate *informed* of their arrest or detention— not to have their consulate intervene, or to have law enforcement authorities cease their investigation pending any such notice or intervention" ' [citation], consular notification may facilitate a defendant's access to assistance, advice, and legal services.  If a defendant is unable to make 'some showing that the violation had an effect on the trial,' the U.S. Supreme Court has explained that even with a 'properly raised and proven' Vienna Convention claim, 'it is extremely doubtful that [a] violation should result in the overturning of a final judgment of conviction.'  [Citation.]  ' "In most circumstances,

16

there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police." [Citation.] Accordingly, the "failure to notify a suspect of his or her consular rights does not, in itself, render a confession inadmissible" under Article 36.' " (*Vargas*, *supra*, 9 Cal.5th at p. 832, italics added.)

Defendant argues that his interview statements should have been suppressed solely because the interviewing investigator had not been trained in the consular notification requirements of the Vienna Convention. He points out that " '[e]xclusionary rules are very much aimed at deterring lawless conduct by police' " (*Colorado v. Connelly* (1986) 479 U.S. 157, 169), including "recurring or systemic negligence" on the part of the police. (*Herring v. United States* (2009) 555 U.S. 135, 144.) He argues that the investigator's lack of training shows this case involves the "type of systemic negligence" that exclusionary rules serve to deter.

Indeed, the investigator's lack of training in the consular notification requirements of the Vienna Convention appears to have fallen short of the requirements of section 834c. The statute provides that, "California law enforcement agencies shall ensure that policy or procedure and training manuals incorporate language based upon provisions of the treaty [i.e., Vienna Convention] that set forth requirements for handling the arrest and booking or detention for more than two hours of a foreign national pursuant to this section prior to December 31, 2000." (§ 834c, subd. (c).) But, defendant's failure to establish prejudice, or any link between the failure to notify him of his consular rights and his waiver of his *Miranda* rights or the voluntariness of his confession, renders his consular notification claim unavailing. (*Vargas*, *supra*, 9 Cal.5th at pp. 834-835.)

17

To be sure, and as defendant points out, the *Miranda* court recognized that foreign nationals may be especially susceptible to making involuntary statements to police, particularly when they are "thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures." (*Miranda*, *supra*, 384 U.S. at p. 457.) Here, however, defendant, though a Mexican national, grew up in Indio, spoke fluent English, was educated, and was 32 years old at the time of his interview. He was more than capable of understanding his *Miranda* rights, and the record shows that he understood those rights and knowingly, intelligently, and voluntarily waived them. Nor does the record show that the investigator employed any "menacing police interrogation procedures" in connection with defendant's interview. (*Ibid.*) To the contrary, the record shows that defendant was treated respectfully and made comfortable before and throughout his interview.

B.  *Defendant Is Entitled to an Additional 49 Days of Presentence Custody Credits*

Defendant claims, and we and the People agree, that defendant is entitled to an additional 49 days of presentence custody credits—a total of 1,067 days, rather than the 1,018 days he was awarded. At sentencing, the probation report recommended and the court awarded defendant 1,018 days of presentence custody credits, comprised of 886 actual days (§ 2900.5), plus 132 days of worktime credit. (§ 2933.1.)

As the parties agree, the award of presentence custody credits fell short because it did not include (1) the 43 days defendant spent in custody between March 15, 2019 (the day he was originally supposed to be sentenced) and April 26, 2019 (the day he was sentenced), plus (2) six additional days of worktime credit, based on the additional 43

18

days he spent in custody (15 percent of 43 equals 6).  (§ 2933.1.)  Thus, defendant is entitled to an additional 49 days of presentence custody credits, or a total of 928 days of actual presentence custody credits plus 139 days of conduct credits.

## C.  *Any Error in Imposing the $1,420 in Fines and Fees Was Harmless*

Defendant claims the court violated his due process rights and his right to be free from excessive fines, by imposing a $300 restitution fine and $1,120 in court assessments ($70 on each of his 16 convictions), without determining if he was able to pay them.  (*People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1168, 1171, fn. 8 (*Dueñas*).)[5]  We conclude that any error in imposing the challenged fine and court assessments was harmless beyond a reasonable doubt.

On appeal, claims of *Dueñas* error are not prejudicial if the record shows they are harmless beyond a reasonable doubt.  (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035; *Chapman v. California* (1967) 386 U.S. 18, 24.)  Any assessment of a defendant's ability to pay the fine and assessments would necessarily include consideration of his or her future earning capacity, including his or her ability to earn wages while incarcerated

---

[5]  In *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, our Supreme Court is currently reviewing whether a court is required to consider a defendant's ability to pay before it may impose or execute fines, fees, and assessments; and, if so, which party bears the burden of proof regarding the defendant's "inability to pay." (*People v. Kopp* (2019) Cal. Lexis 8371, S257844.)  Some appellate courts have also concluded that *Dueñas* was "wrongly decided." (E.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067-1068; *People v. Adams* (2020) 44 Cal.App.5th 828, 831-832.)

in state prison (*People v. Jones*, at p. 1035) and following his or her release. (*People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837.)

Here, the record shows that defendant's future earning capacity is sufficient to pay the $1,420 in fines and assessments. At the time of sentencing on April 26, 2019, defendant was 34 years old. He had worked as a landscaper, earning $15 an hour. His young age and ability to work show that he is presently able to pay the $1,420 in fines and assessments over time while in prison, after release, or some combination of both. Thus, any error in imposing the $1,420 in fines and assessments, without determining that defendant was presently able to pay them, was necessarily harmless beyond a reasonable doubt.

## IV. DISPOSITION

The judgment is modified to award defendant 49 days of additional presentence custody credits: a total of 1,067 days, comprised of 928 actual days plus 139 days of worktime credits (§ 2933.1), rather than the total of 1,081 days he was awarded at sentencing on April 26, 2019. The matter is remanded to the trial court with directions to prepare a supplemental sentencing minute order and an amended abstract of judgment, reflecting this change to the judgment. The trial court is further directed to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS

20

                                                                               J.

We concur:

RAMIREZ _____

                                P. J.

McKINSTER _____

                                J.