Filed 9/23/20  P. v. Sutton CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM SUTTON,<br><br>    Defendant and Appellant. | D075396<br><br><br>(Super. Ct. No. SCN361520) |

APPEAL from a judgment of the Superior Court of San Diego County, Blaine K. Bowman, Judge.  Affirmed.

Mary Woodward Wells, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant William Sutton gave a statement to police that was later admitted at trial.  Defendant argues that the statement was improperly

admitted because he had not expressly waived his *Miranda*[1] rights.  After independently reviewing the circumstances, we conclude that he was not in custody and, in any event, he impliedly and validly waived his rights.

BACKGROUND

*Procedure*

A jury convicted defendant of second degree murder (Pen. Code,[2] § 187, subd. (a), count 1) and elder abuse likely to cause great bodily injury or death (§ 368, subd. (b)(1), count 2).  The jury found true in connection with count 2 that defendant personally inflicted great bodily injury (§ 1192.7, subd. (c)(8)), that the victim was 70 years old or older (§ 12022.7, subd. (c)), and that defendant proximately caused the death of a person 70 years old or older (§ 368, subd. (b)(3)).  On December 17, 2018, the court sentenced defendant to a term of 15 years to life on count 1, murder, and imposed and stayed sentences on count 2 and its attendant enhancements.  Defendant filed a timely notice of appeal.

*Facts*

Margaret W. and Marian K. were close friends who were both over 90 years old.  They each had a home in a senior community in Oceanside.  Marian and Margaret were both active and friendly.  Marian kept her door unlocked so friends could visit.  Margaret usually visited her twice per day.

Marian met defendant in 2013 or 2014.  Defendant was in his mid-60's.  They quickly became friends.  Within a few months, by April 2014, defendant moved into Marian's house to assist her.  They seemed to get along well.  Defendant kept the front door locked so Marian's friends could no longer

---

[1]    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[2]    Further statutory references are to the Penal Code.

2

enter easily. Marian gradually stopped going out to visit friends. Her friends stopped visiting Marian as often because defendant was hostile to them. He called Marian's neighbor "a dirty old whore" and told Marian not to talk with her. When Margaret went to visit Marian one day, defendant told Margaret she was a "fucking bitch" and threatened to push her away unless she left Marian's driveway. After defendant moved in, Margaret generally went to visit Marian only after defendant had left the house.

Defendant left the house on the afternoon of April 16, 2016. A neighbor, J.H., saw Margaret walk up to Marian's home about 3:00 p.m., check the laundry room door, then look through the kitchen door. Defendant returned as Margaret turned to leave. J.H. said they appeared to argue. Margaret put up her hand to defendant, then left. Defendant checked the gate and laundry room door, and left again.

Surveillance video showed Margaret walking to Marian's home later that day at about 5:51 p.m., wearing sunglasses, entering the kitchen door, then leaving, without her sunglasses. Defendant arrived and entered through the laundry door. Margaret returned, opened the screen door to the kitchen, and appeared to be talking through the solid wooden and glass kitchen door to someone inside the house. The solid door was twice opened and slammed closed in Margaret's face. The door was opened a third time, Margaret was pulled inside, and the screen door closed behind her. Marian[3] said defendant was mad at Margaret while they were all in the kitchen. Within seconds, defendant forcefully pushed Margaret out the door, banging open the screen door, down the steps onto the cement patio, cracking the back of her head on the cement. The force with which Margaret was pushed was

---

[3]    Marian passed away before trial. Her conditional examination was played for the jury.

so great that J.H., watching on her video, fell to her knees and screamed. J.H. was devastated, she said, at the sight.[4] Marian came out to the patio, looking frantic according to J.H. Defendant opened the laundry door and threw something out, down the hill. Marian went back inside her home. Defendant washed the blood off the patio and left the house.

Margaret was able to get up and walk away from the house. L.B. saw Margaret stumbling down the street, holding her hand to the back of her head, which was bleeding profusely. There was a gash on the back of her head about an inch and a half long. L.B. helped Margaret get home. Marian and another neighbor arrived to help. L.B. called 911 for an ambulance. Margaret was dazed and getting "foggy," but still able to speak. Margaret was taken to the hospital, where the doctors found a skull fracture, bruising and hemorrhaging in her brain. An officer questioned her in the hospital. Margaret repeatedly said that defendant had pushed her.

Another officer went to Marian's home the next day and talked with defendant. Defendant said that Margaret had fallen but he did not see her fall. Defendant continued to say that he had not pushed Margaret even after the officer told him that the incident had been recorded on a neighbor's surveillance video.

Margaret remained in the hospital for about two weeks. The injured part of Margaret's brain died off, causing her to lose the ability to take care of herself. She was discharged to a hospice care facility. Margaret passed away

---

[4] During closing argument, the prosecutor captured the force of the push to Margaret by describing the "visceral reaction" of the jurors when they watched the tape of Margaret being pushed out the door: "I heard people gasp. I saw people cover their mouths. I saw people move back in their chairs. I saw people with their eyes wide open. . . . the fact that you had that reaction to watching the viciousness and violence and callousness."

on July 9, 2016, about three months after she was pushed onto the patio, fracturing her skull. The forensic pathologist who conducted the autopsy determined that Margaret's death was caused by complications from blunt force trauma. He ruled the death a homicide.

## DISCUSSION

Defendant's sole contention on appeal is that his first statement to the law enforcement officer, made while the officer was at defendant's home, was improperly admitted because defendant did not expressly waive his *Miranda* rights after the officer's advisals.

Waiver of *Miranda* Rights

A.  Background

The People moved in limine to admit statements made by defendant during an interview with police officer Randy Markham that occurred at Marian's home on the day after Margaret's fall. Defendant moved to exclude the interview. The court conducted an evidentiary hearing to determine if defendant's *Miranda* rights had been violated. With defendant's agreement, the court listened to the audio tape and read the transcript before the hearing.

Markham testified that on the day after Margaret's fall, he was outside Margaret's house, in uniform, with his gun holstered. After reviewing the surveillance video from J.H., Markham thought that defendant was the one who had pushed Margaret out the door, causing her fall.

Defendant and Marian drove up to their house. The officer walked over and asked defendant if he could talk with him inside the house. Defendant agreed. Defendant settled Marian in the house, parked his car, walked back and allowed three officers into the house to talk with him and Marian. Markham questioned defendant in a friendly manner.

Defendant walked around the house at first as he answered the officer's questions. Defendant gave conflicting answers. After about seven and a half minutes, Markham asked defendant to sit down. Markham advised defendant of his rights and asked defendant if he understood after each advisal, as follows:

> "[Markham]: Mr., Mr. Sutton, go ahead and have a seat right here.
> "[Defendant]: Okay.
> "[Markham]: Okay. You have the right to remain silent. Do you understand that?
> "[Defendant]: Wait, wait, whoa.
> "[Markham]: I'm going to read you your rights now. Okay?
> "[Defendant]: Okay.
> "[Markham]: You have the right to remain silent. Do you understand that?
> "[Defendant]: Mm-hmm.
> "[Markham]: Any statements you make may be used as evidence against you. Do you understand that?
> "[Defendant]: Well, I don't like where this is going. Do I have to . . . (laughs)
> "[Markham]: Just, just answer it. I'm just going to go through these questions just to let you know.
> "[Defendant]: (unintelligible) you're really making me sweat or something . . .
> "[Markham]: Okay.
> "[Defendant]: I don't know what the problem is but . . .
> "[Markham]: Okay. What I said was, any statements you make may be used as evidence against you. Do you understand that?
> "[Defendant]: Yes.
> "[Markham]: Okay. You have the right to the presence of an attorney either retained or appointed free of charge before and during questioning. Do you understand that?
> "[Defendant]: Mm. Mm-hmm.
> "[Markham]: Okay.
> "[Defendant]: I understand.
> "[Markham]: I saw the video of what happened, and here's what I believe happened.

6

"[Defendant]:  Okay.

"[Markham]:  You shoved or kicked her . . . ."

Markham started questioning defendant after the advisals without first asking if defendant were willing to speak with him.  Defendant continued answering the officer's questions.  Markham proceeded to question defendant for another 30 to 45 minutes.  Throughout this time, no officer told defendant that he was not free to leave and defendant never asked to leave.  Defendant was not isolated with the officers.  Marian, whom defendant called "mom," was in the room with him.  He addressed questions and comments to her from time to time.  He was given water when he wanted it, and he left the living room to go to the bathroom.

At the conclusion of the hearing, the court found that defendant made the statements voluntarily, in compliance with due process.  The court also found that defendant was not in custody when questioned, and that he made an implied waiver of his rights by expressing his willingness to talk with the officers after having been advised of his rights to remain silent and to have an attorney, and being warned that his statements could be used against him.

B.  Legal Principles

Persons in custody or otherwise deprived by law enforcement of their freedom of movement must be fully informed of their rights to remain silent and to have an attorney, and that any statement made by them may be used as evidence against them.  (*Miranda, supra*, 384 U.S. at p. 444; *People v. Caro* (2019) 7 Cal.5th 463, 491 (*Caro*).)  "The warning is meant to protect the suspect's privilege against self-incrimination, which is jeopardized by the inherently coercive nature of police custodial questioning."  (*Caro*, at p. 491, citing *Miranda*, at pp. 478–479.)

7

When reviewing the denial of a suppression motion based on *Miranda* or coercion grounds, we defer to the trial court's resolution of disputed facts if the court's decision is supported by substantial evidence. (*People v. Jackson* (2016) 1 Cal.5th 269, 339.) " ' " ' "We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." ' " ' " (*Ibid*.) When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness. (*Ibid*.)

C. Custody

We first determine whether defendant was in custody when the officer questioned him.

1. Legal Definition

"The purpose of *Miranda* guides the meaning of the word 'custody,' which refers to circumstances 'that are thought generally to present a serious danger of coercion.' [Citation.] Such a danger of coercion is usually present where there has been a ' " ' "formal arrest or restraint on freedom of movement" ' of the degree associated with a formal arrest." ' " [Citations.] The key question is whether, under all of the objective circumstances, a reasonable person in the suspect's position would have felt free to terminate the interrogation. [Citations.] But even if a person's freedom of movement has been curtailed, an ' "additional question" ' arises: ' "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." ' [Citation.] All objective circumstances of the interrogation are relevant to this inquiry, including the site of the interrogation, the length and form of questioning, and whether the officers have conveyed to the subject that their investigation has focused on

8

him or her. [Citation.] This initial custody determination does not depend on ' "the subjective views harbored by either the interrogating officers or the person being questioned." ' [Citation.]" (*Caro*, *supra*, 7 Cal.5th at pp. 491– 492.)

### 2. Analysis

Markham's questioning of defendant did not occur under circumstances that presented a serious danger of coercion. (*Caro*, *supra*, 7 Cal.5th at p. 491.) Defendant was in his own residence, with the woman he lived with. The questioning was short, only 30 to 45 minutes. Defendant was asked to sit down, but there were no restraints on his freedom. Markham thought that defendant was the prime suspect after watching the video and before questioning him, but the subjective views of the interrogating officer are not relevant to the question of custody. (*Id.* at p. 492.)

Defendant did not act like he was in serious danger of being coerced. He continued to deny pushing Margaret. Objectively, under the totality of the circumstances, a reasonable person in defendant's position would have felt free to stop answering the officer's questions. Sitting in the living room of his home, with the woman he called "mom" at his side, was not inherently coercive. We conclude, after independent review, that defendant was not in custody when he was questioned. Even if we had concluded otherwise, defendant validly waived his rights by expressing his willingness to continue answering questions after having been advised of his rights.

### D. Implied Waiver

Defendant acknowledges that he was advised of his rights and that a waiver of *Miranda* rights can be implied when the suspect willingly answers questions without being asked if he agreed to speak to the officer. He

contends, however, that his implied waiver was not effective because of his hesitant responses to the advisals.

    1. Legal Principles

  Federal and state courts have upheld implied waivers of rights. A "waiver of *Miranda* rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.' " (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 (*Berghuis*).) "It is well settled that law enforcement officers are not required to obtain an express waiver of a suspect's *Miranda* rights prior to a custodial interview and that a valid waiver of such rights may be implied from the defendant's words and actions." (*People v. Parker* (2017) 2 Cal.5th 1184, 1216 (*Parker*); *People v. Gonzales* (2012) 54 Cal.4th 1234, 1269 [noting a "defendant's decision to answer questions after indicating that he or she understands the *Miranda* rights may support a finding of implied waiver, under the totality of the circumstances"].)

  " 'In general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them.' [Citations.]" (*Parker*, *supra*, 2 Cal.5th at p. 1216.) " 'A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights. [Citations.] In contrast, an unambiguous request for counsel or refusal to talk bars further questioning. [Citation.]' [Citation.]" (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 218–219 (*Sauceda-Contreras*).)

  "Ultimately, the question becomes whether the *Miranda* waiver is shown by a preponderance of the evidence to be voluntary, knowing and

10

intelligent under the totality of the circumstances surrounding the interrogation. [Citations.] The waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception' [citation], and knowing in the sense that it was 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' [Citation.]" (*Sauceda-Contreras*, *supra*, 55 Cal.4th at p. 219.)

### 2. Analysis

Defendant contends that he was hesitant when advised of his rights and that the officer trivialized the rights when giving them. " '[P]laying down,' for example, or minimalizing [the] legal significance [of *Miranda* rights] may under some circumstances suggest a species of prohibited trickery and weigh[] against a finding that the suspect's waiver was knowing, informed and intelligent." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1237.)

Defendant was surprised when the officer started to advise him of his rights. In each case, the officer repeated the advisal until he got an affirmation that defendant understood the right. When the officer told him that any statements he made could and would be used against him, defendant said he did not "like where this was going" and asked if he "had to . . . ." The officer responded, "Just, just answer it. I'm just going to go through these questions just to let you know." Defendant contends that the officer coerced him by telling him to "just answer it," but defendant did not "just answer" the question after the officer told him to. Defendant made two more comments, then the officer repeated the admonishment in full and asked defendant if he understood it. Defendant answered, "Yes." The officer

11

repeated each advisal clearly and fully before defendant affirmed that he understood.

The officer did not trivialize or minimize the legal significance of the warnings. Instead, as in *Musselwhite*, the officer told defendant what he was constitutionally required to do, that is, he told the defendant of his rights. (*Id*. at p. 1238.) An officer is not required to cease questioning if the defendant's response is " 'ambiguous or equivocal,' " nor to clarify the defendant's thoughts. (*Berghuis*, *supra*, 560 U.S. 381–382; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1087 [officer may, but not required to, clarify ambiguous response].) The officer repeated each advisal in full until defendant affirmed his understanding of the right. Defendant continued to freely answer the officer's questions, as in *McCurdy*, showing that he impliedly and validly waived his rights. (See *McCurdy*, at p. 1037.)

Defendant argues for the first time in his reply brief that his reference to the need for a lawyer implicated the Sixth Amendment right to counsel. He provides no record citation for such a reference, however, and we have found none in our review of the interview at his house.

After he was properly admonished of his *Miranda* rights, defendant willingly continued answering questions posed by the officer for the next half hour. Based on our independent review of the record of the questioning, we conclude by a preponderance of the evidence that defendant freely, knowingly, and voluntarily waived his *Miranda* rights when he continued to answer the officer's questions about Margaret's fall. (See *Sauceda-Contreras*, *supra*, 55 Cal.4th at pp. 218–219.)

12

DISPOSITION

The judgment is affirmed.

BENKE, Acting P. J.

WE CONCUR:

IRION, J.

GUERRERO, J.